Tile opinion of the Court was delivered by
Fenner, J.
In a certain suit, before tbe Civil District Court for the Parish of Orleans, entitled W. Van Benthuysen vs. Liversey et al., the plaintiff represented, substantially, that, t.be defendants, as proprietors and publishers of a certain newspaper of this City, known as “ The Mascot,” bad theretofore published certain false, malicious and libellous cartoons and editorial paragraphs, libelling and defaming him, and designed and calculated to injure and destroy bis character and reputation as a man and a citizen. He further represented that he feared thattlie wicked, wanton and malicious libels, which had been made 'upon him in a prior issue of said newspaper, would be repeated in the next and in other future issues, and would thereby inflict upon him further irreparable injury and damage; wherefore, he prayed for and obtained, on a bond of fifty dollars, a writ of injunction, “ enjoining, restraining and prohibiting the said defendants and each of them from publishing or causing to be published in any manner, and particularly in ‘ The Mascot,’ to he issued on the 29th of April, 1882, or in any and all future issues of said ‘ Mascot,’ any defamatory cartoon or caricature of petitioner, and from naming or alluding to petitioner in any way calculated to disparage him in the estimation of the community, and that after due proceedings are had herein, said injunction may be made perpetual.”
No other relief was asked.
After the issue and service of this injunction, which issued according to our practice ex parte, the plaintiff, averring the defendants, had wilfully disregarded and disobeyed said injunction by publishing in a *742 subsequent issue of the Mascot, grossly libellous matter against liim, took a rule upon defendants to show why they should not be punished for contempt.
In return to this rule, the defendants filed their answer, substantially averring that their right to publish a newspaper, and to express and insert therein, without prior restraint, what they, as editors and proprietors, think right and proper, is protected by the fundamental principles of republican government and by the Constitutions of the State and of the United States; that courts have no power, by injunction, to abridge, destroy or restrain the exercise of this right; that the injunction issued was improvident and beyond the jurisdiction and power of the court; that they were not bound by the same, but that their constitutional right continued as if the same had not been issued ; that as to the question of fact whether the publications charged as violative of the injunction, were or not libellous or defamatory of plaintiff, that was a question upon which they were entitled to a hearing and to a trial, and to a trial by jury, if they so desired, and that the Judge was incompetent to pass upon the saíne on a rule for contempt, and could not do so without prejudicing the merits of the case ; and, disclaiming any intention to be in contempt of the court, they asked that the rule be discharged.
Thereupon, the court, after hearing evidence on the part of plaintiff, defendants offering none, made the rule absolute, and committed the. defendants to imprisonment in the Parish Prison for the term of ten days, which sentence is now in process of execution.
The said defendants, appearing as Relators in the instant cause, upon appropriate, allegations, the nature of which may be inferred from the, foregoing statement, apply for the writs of certiorari and prohibition, and pray that all of the proceedings in the said suit of Van Benthuysen vs. Liversey et al., including the injunction, be decreed to be absolutely null and void, and that the same be set aside, and that further proceedings in the cause be prohibited.
I.
It is to be observed that the power of the District Court to take cognizance of the cause referred to, depends entirely upon its power to issue the preliminary injunction applied for. The only relief sought is, in limine, the injunction, and, on final hearing, a judgment perpetuating the same.
If we hold that the court was without power to issue, the preliminary injunction, and should annul the same, that would be an end of the suit, because it would eliminate the entire subject matter thereof.
*743 II.
The Constitution of the State of Louisiana contains a Bill of Rights. Such Bills are modelled upon the famous English Bill of Rights, and, in the language thereof, are intended as public declarations of the “ true, ancient and indubitable rights of the people.” They are declaratory of the general principles of republican government, and of the fundamental rights of the citizen, rights usually of so fundamental a character, that, while such express declarations may serve to guard and protect them, they are not essential to the creation of such rights, which exist independent of constitutional provisions.
In our Bill of Rights, side by side with the rights of bearing arms, of religious freedom, of free speech, of assembly and petition, of habeas corjms, is found the declaration that “ no law shall be passed abridging the freedom of the press.”
A similar provision has existed in every Constitution of this State, exists in the Constitution of the United States and that of every State of this Union. It is a principle of English and American government, and whatever variety may be found in the forms of expression used in different instruments, they all signify the same thing, and convey the general idea which is crystallized in the common phrase, “ liberty of the press.” This is what the Constitution intends to recognize and to guarantee, and in order to ascertain what meaning and effect to give to the Constitution, we have only to inquire what is meant by “liberty of the press.”
We have not far to go. Even so elementary a work as a law dictionary fully defines the phrase as follows : “ This expression imports freedom from any censorship over what shall be published; exemption from control in advance over the dissemination of ideas by printing. It does not import that one may not be mulcted in damages or punished’ for what he has published, if, after the act, it is shown to be contrary to law, but that he shall not be restrained beforehand. The favorite idea in England and America has been that every person may freely publish what he sees fit, and any judgment of the law upon it shall be reserved till afterwards.” Abbott’s L. D., “ Liberty of the Press.”
Perhaps in the whole range of legal propositions, susceptible of dispute, there is not one that commands so unanimous a concurrence of judges and jurists.
“ Liberty of the press,” says Delolme, “consists in this: that neither courts of justice, nor any other judges whatever, are authorized to take notice of writings intended for the press, but are confined to those which are actually printed.” Delolme, Const. of Eng. 254; 4 Blackstone Com. 151; Story on the Const. § 1889; 2 Kent’s Com. 17, et seq; Cooley’s Const. Lim. 420, et seq.; Townshend Slander and Libel, § 252.
*744 The Constitutions of several of the 'States contain provisions expressly embodying the above ideas. Thus that of Maine says :
“ Every citizen may freely speak, write and publish his sentiments on any subject, being responsible for the abuse of tills liberty.”
So in those of New York, New Jersey, Pennsylvania, Delaware, Maryland, Ohio, Illinois and numerous other States. Although the provisions in these several Constitutions are fuller in expression than that of our own, they are generally found like ours, in Bills of Rights, and are merely intended to convey the recognition of the same general principle, “ liberty of the press ” as a fundamental right of the citizen. We are to construe and give effect to our provision, precisely as if it declared, in the language of the Constitution of Minnesota, “ the liberty of the press shall forever remain inviolate, and all persons may freely speak, write and publish their sentiments on all subjects, being-responsible for the abuse of such right.”
III.
Having thus concluded that the meaning and effect of Art. 4 of the Bill of Rights in our present Constitution are to proclaim and guarantee the principle of “liberty of the press,” as understood and established by English and American law, and having ascertained the extent and meaning of that principle, we are next to inquire whether any court can have power, airthority or jurisdiction to restrain, suspend or abridge the exercise, by any citizen, of a right declared absolutely to belong to him by the Bill of Rights embodied in the fundamental law of the State. Courts necessarily derive all their powers from the Constitution and laws of the State. They can have no power which the Constitution withholds and which no law could confer upon them. It will be admitted that there are many human rights entirely beyond the control of judicial power. A court’s injunction prohibiting a man from eating, or drinking, or walking, or lying down, would, of course, be the merest bruturn fubnen. Perhaps few would deny that an injunction restraining a citizen from bearing arms, would be equally inoperative; or one restraining citizens from assembling and petitioning the government for redress of grievances; or one prohibiting the free exercise of religion. Why? Because these are fundamental rights, recognized and declared to be such in the Bill of Rights. But how can a different rule be applied to any other right similarly guaranteed by the same Bill of Rights ?
Suppose the Legislature were to pass a law authorizing any person, on presenting a petition to a court representing that he feared that the proprietors of a newspaper, or other parties, would publish, or cause to be published, libellous or defamatory matter concerning him, to obtain *745 from the court au injunction restraining the publication of such matter, and authorizing the court to grant such injunction, and, during its pendency, to supervise the publications of such defendants on rules for contempt, and to decide for itself, without trial by jury or in ordinary form, and without appeal, upon whether the same were libellous and defamatory, iu contravention of the injunction, and in case of so finding, to punish the defendants for contempt, and, under like circumstances, to repeat said punishment as often as occasion might require — would any one question the unconstitutionality of such a law 1
It would establish a complete censorship over the press so enjoined. No legal distinctions are nicer than those concerning libellous and defamatory publications. Some are privileged and others non-privileged. How should defendauts determine whether their publications were innocent or offensive 1 What they consider innocent, the judge might consider libellous. There would be no safe course, except to take the opinion of the judge beforehand, or to abstain entirely from alluding to the plaintiff. What more complete censorship could be established ? Uuder the operation of such a law, with a subservientor corrupt judiciary, the press might be completely muzzled, and its just influence upon public opinion entirely paralyzed. Such powers do not exist in courts, and they have been constantly disclaimed by the highest tribunals of England and America. It has passed into a settled rule of jurisprudence, that “ courts of equity will not lend their aid to enjoin the publication of libels or works of a libellous nature; eveu though the libellous publication is calculated to injure the credit, business or character of the person against whom it is directed.” High on Injunctions, §§ 1015, 1093, and numerous authorities cited.
In England and in the common law States of this Union, courts of equity alone have power to issue injunctions. They decline to do it in such cases, on the two-fold ground that they have no such jurisdiction, and that the remedy at law is ample. What is the remedy at law ? Nothing but an action for damages or criminal prosecution. Those remedies exist under our law as amply as elsewhere, and they are the only remedies.
We cannot admit that the liberty of the press is less secure in Louisiana than in England, or in other States of this Union, or that courts have greater powers to control and restrain it here than elsewhere. Cases exist of authority, perhaps doubtful, in which courts have interfered to prevent the continuous publication of a particular hurtful advertisement, or of special statements- or notices injurious to the business of another; but no court in England or in this country has ever, in modern times, assumed the power to issue a sweeping injunction prohibiting a person generally from publishing any defam *746 atory matter whatever concerning another, or “ from naming or alluding to him in any way calculated to disparage him in the estimation of the community,” like the one issued in the present case. We are compelled to hold that if there existed any law authorizing a court to issue such an injunction, it would be grossly unconstitutional. The .exercise of such authority by a court is a direct violation of the Constitution, ultra vires, and is absolutely null and void.
IV.
Holding the injunction to be an absolute nullity, what is the effect upon the proceeding for contempt? The general rule, in matters of injunction, is, that where the court had no power to grant the injunction, and where the mandate is, therefore, absolutely void, the defendants cannot be punished for contempt for its alleged violation. Dwarris on Stat. p. 542; Freeman on Judgments, § 137; High on Injunctions, $§ 1425 and 1286, and authorities there cited.
Thus, it is said, “where the law imposes an absolute duty on a public officer and the court commands him not to perform that duty, he must obey the law and disobey the order of the court.” So, when the Constitution, in its Bill of Rights, recognizes and declares the existence of an absolute and fundamental right in a citizen, and a court enjoins him from the exercise of such right, he is authorized, always at his risk, to follow the Constitution and not the order of the court. This is not meant to authorize resistance to the orders or processes of the court while the same are operative. He must endure the consequences of his disobedience until, in some orderly course of procedure, he procures from competent authority the annulment of the mandate claimed to be unconstitutional and void; but the moment such annulment is pronounced, his condemnation for contempt falls with it, and his sentence, though not completely executed, expires.
The case, of State ex rel. Follett vs. Rightor, 32 A. 1182, contains •matter apparently opposed to this view. But that case dealt with questions and rights much less fundamental in their character than those here presented, and is, in many respects, distinguishable from this.
Besides, in the exercise of our supervisory jurisdiction, under Art. 90 of the Constitution, we are not absolutely controlled by technical rules of proceeding.
As before intimated, we regard the injunction herein as standing upon the same plane as an injunction restraining a citizen from bearing arms-or from'exercising the most sacred right, and it, therefore, furnishes a case for the liberal exercise of our supervisory power.
*747 We have, heretofore, laid down general rules by which we should be guided in the administration of this extraordinary power, and we will not be accused of a disposition to stretch the same. But, in view of the obvious purposes had in view by the framers of the Constitution, we have been careful to reserve our discretionary right to make exceptions to such rules, in cases of urgent public importance and interest such as we consider the present one to be. State ex rel. City vs. Judge, 32 A. 540; State ex rel. Sinnott vs. Falls, Id. 553.
In conclusion, we would disclaim all intention to reflect upon the motives or even the conduct of the distinguished judges whose action we have reviewed. No officers of this commonwealth would be less likely, knowingly, to assault the liberty of the press or the constitutional rights of any citizen.
It is to be remembered that the questions are new in this State; that the judge who granted the injunction was called upon to act instanter on the face of the papers, and without the opportunity which we have had of examining the matter, and that the judge'who acted on the proceeding for contempt, was considering merely ■ the violation of a mandate, not issued by himself, but by a brother magistrate.
We join the counsel in this case, in common with all wise and just men, in reprobation of abuses of the liberty of the press. It is the duty of all good citizens, as well as magistrates, to apply vigorously and fearlessly the remedies which the law provides for such abuses, both civil and criminal.
Nothing would threaten the permanence of the liberty of the press so gravely as its degeneration into unbridled licentiousness.
But libel and slander, like other crimes and offenses, are the subjects of punitory, and not of merely preventive, remedies. The Constitution rules over all.
It is, therefore, ordered, adjudged and decreed, that all the proceedings in the matter No. 5923, on the docket of the Civil District Court for the Parish of Orleans, entitled, W. Van Benthuysen vs. Jos. Liversey et al., be declared null and void, and be set aside.
The Chief Justice dissents, and Justices Poché and Todd concur iix this opinion and reserve their right to file concurring opinions.